UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEBRASKA

In Re: Jerry V. Kurtz,                                    Bankruptcy No. 18-40959
                                                              Chapter 7

                           Debtor.
_____/

Gary Takuski and Camille Takuski,

                           Plaintiffs,
          vs.                                            Adversary No. 18-4023

Jerry V. Kurtz,

                           Defendant.
_____/

**MEMORANDUM AND ORDER**

**I.     Introduction**

On September 14, 2018, Plaintiffs Gary and Camille Takuski filed a Complaint alleging Debtor/Defendant Jerry V. Kurtz made false representations knowing they were false.  Doc. 1.  The Takuskis claim "[t]he actions of Debtor constituted a fraud upon Takuski, a misrepresentation of fact."  Doc. 1 at 3.  The Takuskis seek an order excepting the debt Debtor owes them from discharge under 11 U.S.C. § 523(a)(2)(A). Debtor filed an Answer denying that he defrauded the Takuskis and asking the Court to dismiss the Complaint.  Doc. 8.

In February 2019, the Takuskis filed a Motion for Summary Judgment, which Debtor opposed. The Court denied the motion, finding genuine issues of material fact barring judgment as a matter of law.  Doc. 31.  The adversary proceeding trial took place on April 22, 2019.

## II.    FACTS

### A.    Background

For 17 years, the Takuskis have owned and lived on land in Scotts Bluff County, Nebraska.  The Takuskis are not farmers.  Gary Takuski is retired after a career in construction, and Camille Takuski is a real estate appraiser.  For many years prior to and during 2017, the Takuskis leased some or all of their farmland.

Prior to 2017, Debtor farmed with and for his father, A. Gilbert Kurtz.[1]  Gilbert Kurtz farmed the Takuskis' land in at least one year prior to 2017, but he declined to do so during the 2017 crop season.

In crop year 2017, alfalfa grew on some of the Takuskis' land.  Debtor and Gary Takuski (on behalf of the Takuskis) reached an oral agreement that Debtor would harvest and market the 2017 alfalfa.  They also agreed that Debtor would receive 50% of the value of the alfalfa hay sold and the Takuskis would receive the other 50%.  In addition, they agreed they would share the related farming expenses equally.  Both parties refer to this arrangement as a crop share agreement.[2]

---

[1] Gilbert Kurtz farmed 1100 acres of land he owned in 2017.  He passed away in the spring of 2018.

[2] During the 2017 crop season, Debtor also planted, cultivated, harvested and marketed oats grown on the Takuskis' farmland.  The parties agreed that the Takuskis would receive one-third of the proceeds from this crop and Debtor would receive two-thirds of the proceeds.  When Debtor sold the oats to a feedlot, the feedlot deducted the expenses it incurred for chopping and swathing.  After those expenses were deducted, the parties divided the net proceeds proportionally.

2

The parties disagree about other terms of the agreement. Specifically, the Takuskis understood that they would receive their half of the alfalfa proceeds at the time Debtor marketed the hay.[3] The Takuskis also assumed that the person who incurred a related crop expense would bill the other party for his/their share of the expense at the end of the season. Gary Takuski testified that this was "the usual" practice. The Takuskis did not confirm these terms of the crop share agreement with Debtor before he began farming for them.

Based on his prior experiences with share crop agreements, Debtor assumed that the parties would "settle up" both 2017 alfalfa proceeds and related expenses at the end of the season. He testified that this was his standard practice when he and a landowner did not know the sum of the crop expenses at the time he marketed the crop.[4] He maintained that, when cultivating, harvesting and marketing alfalfa, he had

---

Debtor also farmed millet on the Takuskis' land in 2017. The millet crop froze. Debtor paid all farming expenses related to farming millet but realized no income from this crop.

Debtor only farmed on the Takuskis' land in 2017.

[3] Gary Takuski's testimony about whether he expected payment immediately after the hay was marketed is not entirely consistent. He conceded at trial that he and Debtor did not set a date or agree on a specific event that would trigger Debtor's obligation to pay the Takuskis.

[4] Debtor distinguished his oat share crop agreements from the alfalfa share crop agreements. He explained that he knew the expenses related to harvesting oats when he marketed them to the elevator. The same was not true for cultivating, harvesting and marketing alfalfa.

3

"never done it" the way the Takuskis suggested.  He further opined that it made "no sense" to split gross proceeds without knowing the expenses.

According to Gary Takuski, after he and Debtor reached an agreement, Gary "backed off on the farm" and was not involved in the operations.  Despite this representation, Gary testified that he would often "stop and visit" with Debtor, at least in the beginning of the crop year.

Debtor harvested the first cutting of the alfalfa hay in June and the second cutting in August.  Gary Takuski testified that he and Debtor did not speak between the two cuttings, but he knew Debtor sold the cuttings.

Debtor sold both the first and second alfalfa hay cuttings to JR Wiedaman from G.W. Grinding.  Wiedaman and Debtor are—or were—close friends.  During the sale process, Wiedaman asked Debtor whose name(s) to print on the check for alfalfa hay.  According to Wiedaman, Debtor asked Wiedaman to make the check payable to Debtor only because he "cash rented the land."  Debtor disputes telling Wiedaman that he had a cash rent agreement with the Takuskis.

Per Debtor's instructions, Wiedaman issued a check to Debtor in Debtor's name only to pay him in full for the first and second cuttings.[5]  Debtor did not give Takuskis their share of the alfalfa hay proceeds.

---

[5] According to Wiedaman, when the discussion of payment arose after the first cutting, Debtor asked Wiedaman whether Wiedaman had performed a lien search. Debtor stated that he thought John Deere Credit would be the only lienholder that might appear on a lien search.  Debtor testified that the search result referencing John Deere Credit related to a motor home awarded to his ex-wife in divorce

Debtor explained that he did not give the Takuskis any proceeds from the first or second cuttings because he incurred expenses related to crop spaying, swathing, baling and stacking.  At trial, Debtor was unable to specifically recall what he did with the proceeds from the first cutting but asserted it was "all involved in farming." According to Debtor's interrogatory responses, he purchased a grain drill and leased a tractor with the alfalfa hay crop he sold.  Doc. 36 at 4.

During the summer of 2017, Debtor also obtained a corn packing job.  He told Wiedaman that he was seeking to lease or buy a tractor for this work and asked for an advance on crop sales.  Sometime after Debtor sold the first and second alfalfa cuttings to Wiedaman, Debtor negotiated advance funds from Wiedaman for future alfalfa cuttings (including those harvested from the Takuskis' land) and the millet crop Debtor was farming.  Wiedaman agreed and issued a $47,000 check as a prepayment for these crops.  See Ex. 40.

Debtor used the money Wiedaman advanced him to purchase a grain drill to plant millet and oats and to repay his father for fertilizer and spraying expenses.  He

---

proceedings. Wiedaman's wife ran a lien search; only John Deere Credit appeared on it.

At trial, Debtor explained that he asked Wiedaman to conduct a lien search because he did not want any problems arising from past financial difficulties related to his divorce.  Debtor also expressed concern about whether any of his creditors had filed agricultural liens.  He explained that after a couple hail storms and Debtor's other financial problems, he began working for his father.  Debtor maintained his father was also in financial trouble and unable to pay Debtor "the last four months." Debtor asked for the lien search to make sure he "did not have any problems" with Wiedaman or any other creditor.

5

also leased a tractor to pack corn as he had discussed with Wiedaman. Unfortunately, "they only got one-third of the amount of corn they expected," and Debtor did not earn as much money packing corn as he anticipated.

According to Wiedaman, he and Debtor spoke weekly about Debtor's farming operations.  At some point, the millet crop for which Wiedaman had prepaid Debtor froze, rendering it worthless.  Wiedaman became concerned about Debtor's ability to repay him.

Approximately four weeks after the second cutting, Gary Takuski thought it was time for Debtor to pay him, so he contacted Debtor.  Gary Takuski claims Debtor told him that Debtor would no longer farm for him—which Debtor maintains is untrue. According to Gary Takuski, Debtor explained that he was having financial difficulties and used the proceeds from the first two cuttings to pay for a tractor.  Gary Takuski claims Debtor told him he would sell the tractor to pay the Takuskis.  Gary Takuski also testified that Debtor told him he would give the Takuskis the money from the third cutting.

Debtor conceded that he told Gary Takuski he would give him the money from the third cutting.  Debtor maintains that he made this statement to Gary Takuski because he wanted to pay the Takuskis.  At the time of the conversation between Debtor and Gary Takuski regarding the proceeds from the third cutting, Debtor had already harvested and baled the third cutting.

After Debtor allegedly told Gary Takuski that he would not continue to farm the Takuski land and that he would give Takuskis the proceeds from the third cutting,

6

Gary Takuski paid a third party to stack the bales.  Gary Takuski paid for this service even though stacking hay bales falls within the scope of work Debtor agreed to perform for the Takuskis.  Gary Takuski testified that he thought the hay was his crop to sell.

A short time later, Gary Takuski called G.W. Grinding to find out whether Wiedaman was interested in buying the third cutting.  Gary Takuski learned that Debtor had already sold the third cutting to G.W. Grinding, and G.W. Grinding had ground and hauled the hay per Debtor's instructions.  Wiedaman kept the proceeds from the third cutting as partial payment for the debt Debtor owed for the advance on the alfalfa hay and millet crop.

Debtor expressly denied that he intended to defraud the Takuskis.  He considered Gary Takuski a good friend.  At trial, Debtor claimed that there was no profit on the crops after deducting expenses.  Debtor also claimed that, if the millet had not frozen and if there had been more corn for him to pack, he could have paid the Takuskis.  When asked how he planned to give Gary Takuski the proceeds from the third cutting when he had already told Wiedaman that Wiedaman could keep the proceeds from the third cutting, Debtor answered that his plan was to pay the Takuskis when Wiedaman paid Debtor.  Naturally, this explanation gives the Court pause.

Debtor never paid the Takuskis for the alfalfa hay he harvested from their land and sold to Weidaman.

**B.     Debt Calculations**

**1.     Crop Proceeds:**

Weidaman paid Debtor the following sums for the alfalfa hay he harvested

from the Takuskis' property:

|  | Tons Harvested | Price per Ton | Sum Debtor Received |
|---|---|---|---|
| First Cutting | 143.71 | $115 | $16,526.65 |
| Second Cutting | 167.65 | $115 | $19,279.75 |
| Third Cutting | 46.70 | $115 | $ 5,370.50 |
|  |  |  | $41,176.90 |

Proceeds owed to Takuskis before expenses:          $20,588.45

**2.     The Takuskis' Expense Claims:**

The parties agree that Debtor "was required to pay" the Takuskis 50% of their

2017 electrical power bill and 50% of their hay stacking bill.  Debtor failed to pay

these bills.  Doc. 38 at 3–4, RFA 13–16.

| Bill: |  | Debtor's share: |
|---|---|---|
| Roosevelt Electric | $3,781.04 | $1,890.52 |
| Derrick Hessler Stacking | $  546 | $   273.00 |
|  |  | $2,163.52 |

Takuskis' Damages Claim:[6]                    $22,751.97

---

[6] This claim does not include expenses incurred by Debtor.

### 3.    Debtor's Expense Claims:

Debtor offered evidence showing his father received bills for several farming-

related expenses.  He credibly testified that two of these bills related to Debtor's

efforts to increase the alfalfa productivity on the Takuskis' land:

Bill:                                                    Takuskis' share:
SGS Scottsbluff – spray aerially applied by
Ag Flyers – Job #857394 for flea beetle on
Takuski north, 69 acres of alfalfa.
Doc. 54.  $546.22                                        $273.11

SGS Scotts Bluff – spray aerially applied by
Ag Flyers – Job #853035 for weevil,
47 acres of alfalfa.
Doc. 55.  $372.03                                        $186.02

Debtor did not offer evidence sufficient to show that other invoices he offered

as evidence are attributable to the alfalfa, as opposed to other crops grown on the

Takuskis' land or farming other crops on other land.  See Docs. 52 and 53.[7]

## III.    Analysis

The Takuskis assert that the debt owed by Debtor should be excepted from

discharge under section 523(a)(2)(A) because it was obtained by false

---

[7] The Court received several tickets related to grinding hay, but it appears that this evidence was offered to show the weight of the hay.  It is not clear whether the companies that ground the hay charged Debtor for these services or what the sum of these charges might total.  The Court requested the parties to summarize their views of the debt allegedly owed by Debtor to the Takuskis or damages arising from the alleged misconduct.  Debtor did not list or summarize his expenses.  Consequently, the Court declines to consider Docs. 41–44 as evidence supporting Debtor's claim that he is entitled to deduct expenses from the total alfalfa hay proceeds owed to the Takuskis.

representations and actual fraud.  Some courts require a two-part analysis under section 523(a): first, the courts determine the validity of the debt under applicable law; and second, the courts determine whether the debt should be excepted from discharge under section 523.  Hatfield v. Thompson (In re Thompson) 555 B.R. 1, 8 (B.A.P. 10th Cir. 2016); Valadez v. Salazar (In re Salazar), 2019 WL 267777, at *8 (Bankr. D. Utah Jan. 18, 2019); Thomas Concrete of Ga., Inc. v. Osbourne (In re Osbourne), 2017 WL 1166293, at *3 (Bankr. N.D. Ga. Mar. 28, 2017); Crawford v. Vanwinkle (In re Vanwinkle), 562 B.R. 671, 677 (Bankr. E.D. Ky. 2016); Symonies v. Sobol (In re Sobol), 545 B.R. 477, 490 (Bankr. M.D. Pa. 2016); Smith v. Davenport (In re Davenport, 491 B.R. 911, 921 (Bankr. W.D. Mo. 2013); Farooqi v. Carroll (In re Carroll), 464 B.R. 293, 312 (Bankr. N.D. Tex. 2011).  This analysis appears most appropriate where the underlying debt is disputed, as in this case.  Accordingly, the Court will apply this two-step analysis.

### A.    Validity of the Debt

To establish the validity of the debt, the plaintiff must establish that the debtor is liable on an enforceable obligation under applicable nonbankruptcy law.  In re Thompson, 555 B.R. at 9.  As articulated by the Tenth Circuit Bankruptcy Appellate Panel:

> "Debt" is defined in the Code as "liability on a claim," and "claim" is defined in turn as a "right to payment." For purposes of § 523(a)(2)(A), "debt" means liability on "an enforceable obligation." Whether a debt exists is determined by looking to applicable law, frequently state law. Section 523(a)(2)(A)'s use of the term "any debt" (emphasis added) indicates that "debt" as used in § 523(a)(2)(A) is not restricted to a debt established under any particular theory of recovery. To establish the

10

validity of the debt under § 523(a)(2)(A), the claimant must establish
that the debtor is liable on an enforceable obligation under applicable
law, nothing more nor less.

Id. at 8–9 (citations omitted).

The Court looks to Nebraska law to determine whether Debtor is liable to the

Takuskis under an enforceable obligation.  The Takuskis' claim arises from Debtor's

alleged breach of the parties' oral contract.  "'[T]o recover in an action for breach of

contract, the plaintiff must plead and prove the existence of a promise, its breach,

damage, and compliance with any conditions precedent that activate the defendant's

duty.'" U.S. v. Neb. Beef, Ltd., 901 F.3d 930, 934 (8th Cir. 2018) (quoting Henriksen

v. Gleason, 263 Neb. 840, 643 N.W.2d 652, 658 (2002)) (citation omitted). "'A breach

is the nonperformance of a duty[.]'" Id.  (quoting Weber v. N. Loup River Pub. Power

& Irrigation Dist., 288 Neb. 959, 854 N.W.2d 263, 271 (2014)).

 The Takuskis allege that Debtor failed to comply with their agreement and

claim they are entitled to damages.  Debtor asserts that "the parties had a verbal

agreement but not a meeting of the minds as to the details of the agreement."  Doc.

67 at 6.  Specifically, he cites the parties' differing expectations regarding when

expenses would be deducted in determining profit.  The Court finds that the parties

reached an oral agreement requiring Debtor to harvest and market alfalfa and share

with the Takuskis 50% of the net proceeds after deducting 50% of the expenses.

There were no conditions precedent applicable in this case.  Debtor failed to deliver

net proceeds from the sale of alfalfa hay to the Takuskis, resulting in a breach of the

contract and damages, only if the proceeds less 50% of all expenses related to the
harvest and marketing of alfalfa are greater than zero.

The evidence shows that Debtor received $41,176.90 from the sale of alfalfa
hay harvested from the Takuskis' land and that the Takuskis' share of this sum is
$20,588.45 before expenses are deducted.  The Takuskis assert—and Debtor
concedes—that Debtor was obligated to pay the Takuskis 50% of their 2017
electrical power bill and 50% of their hay stacking bill.  Debtor failed to pay these
bills.  The undisputed sum Debtor owed to Takuskis before accounting for Debtor's
expenses is $22,751.97.

Debtor claims he was billed for certain crop-related expenses, and the
Takuskis did not pay their share of these expenses.  Doc. 36 at 2.  Specifically, he
claims the Takuskis did not pay him for their share of "fertilizer or other expenses."
Doc. 36 at 2.  He also maintains he was billed for all the swathing and stacking costs,
not just his half of the costs.  Doc. 36 at 3.  Debtor also claims "there was also a
millet crop that [he] carried all the expenses for seed, fertilizer, etc."  Doc. 36 at 3.

Debtor offered evidence sufficient to show that two bills he received were
attributable to his efforts to increase the alfalfa crop productivity on the Takuskis'
land.  These expenses totaled $918.25.  Deducting the Takuskis' share of Debtor's
expenses ($459.13) from sum they are owed for their half of the alfalfa proceeds and
their expenses ($22,751.97), the total sum of the debt Debtor owes the Takuskis is
$22,292.84.   Accordingly, the Court finds that Debtor breached the oral agreement

with the Takuskis, the Takuskis damages total $22,292.84 and $22,292.84 is the sum

of the "valid debt" Debtor owes the Takuskis under Nebraska law.

Next, the Court must decide if this debt is chargeable in bankruptcy.

Specifically, the Court must determine whether the debt was for money, property,

services, or an extension, renewal or refinancing of credit that was obtained by a

false representation, false pretenses or fraud.  See 11 U.S.C. § 523(a)(2)(A); In re

Thompson, 555 B.R. at 10; Husky v. Ritz (In re Ritz), 567 B.R. 715, 762 (Bankr. S.D.

Tex. 2017).

## B.      Debts Excepted from Discharge Under Section 523(a)(2)(A)

Section 523(a) of the Bankruptcy Code excepts certain debts from discharge

in bankruptcy, including debts for money, property, services, or an extension,

renewal, or refinancing of credit, to the extent obtained by false pretenses, a false

representation or actual fraud. 11 U.S.C. § 523(a)(2)(A). To meet their burden of

proving that Debtor is not entitled to a discharge of a debt owed to them under this

section, the Takuskis must show that Debtor:

> (1) made a representation, (2) with knowledge of its falsity, (3)
> deliberately for the purpose of deceiving the creditor, (4) who justifiably
> relied on the representation, and which (5) proximately caused the
> creditor damage.

Hernandez v. Gen. Mills Fed. Credit Union (In re Hernandez), 860 F.3d 591, 602 (8th

Cir. 2017) (citation omitted); Hasley v. Irons (In re Irons), 2017 WL 943897, at *2

(Bankr. D. Neb. Mar. 9, 2017).  Courts construe exceptions to discharge narrowly to

facilitate the debtor's fresh start.  Kassebaum v. Smith (In re Smith), 591 B.R. 741,

747 (Bankr. D. Minn. 2018) (citing Reshetar Sys., Inc., v. Thompson (In re

Thompson), 686 F.3d 940, 944 (8th Cir. 2012)).  A creditor seeking to except a debt

from discharge for fraud has the burden of proving each element of section

523(a)(2)(A) by a preponderance of the evidence.  Grogan v. Garner, 498 U.S. 279,

286–87, 111 S.Ct. 654 (1991).

        a.        False Representations

        1.        Statements to JR Weidaman

The Takuskis argue Debtor made false statements to JR Weidaman regarding

both the nature of the agreement between the Takuskis and Debtor as well as the

appropriate manner of payment for the hay.  Doc. 66 at 4.  This argument does not

advance their claim.  Even if the Court were to find that the Takuskis established that

Debtor's statements to JR Weidman were knowingly false and made with intent to

deceive the Takuskis, the Takuskis offered no evidence that they knew about the

statements to JR Weidaman. If the Takuskis did not know about Debtor's statements

to JR Weidaman, they could not have justifiably relied on them.  See First Horizon

Home Loan Corp. v. Apostle (In re Apostle, 467 B.R. 433, 443–444 (Bankr. W.D.

Mich. 2012) ("It is impossible to conclude that the Plaintiffs *actually relied* on the

misstatements . . . because there is no evidence that the Plaintiffs were even

remotely *aware* of those misstatements.") (emphasis in original).  Accordingly, the

Takuskis failed to meet their burden of proving that any statements made by Debtor

to JR Wiedaman provide a basis for nondischargeability under section 523(a)(2).

2.      Statements to Gary Takuski

The Takuskis also assert that Debtor made a false statement to Gary Takuski

regarding the third alfalfa hay cutting.  Doc. 66.  Specifically, they allege that Debtor

told Gary Takuski that he did not have the funds from the first two cuttings, but that

he would sell a tractor to obtain the funds and the Takuskis could have all the

proceeds from the third cutting.  Id.  The Takuskis maintain that Debtor knew this

representation was false when Debtor made it because Debtor had already pledged

the proceeds from the third cutting to Weidaman and had no intention of remitting the

proceeds to them.

Debtor concedes telling Gary Takuski he would give him the money from the

third cutting.  At the time Debtor made this representation to Gary Takuski, Debtor

had already promised Weidaman that Weidaman could keep the proceeds from the

third cutting as partial payment for the debt Debtor owed for the prepayment on the

alfalfa hay and millet crop.  Therefore, the Takuskis established that Debtor made a

representation with knowledge of its falsity.

To meet the third element of their claim under section 523(a)(2)(A), the

Takuskis must show that Debtor "acted with the subjective intent to deceive the

creditor."  Phillips 66 Co. v. Miltenberger, (In re Miltenberger), 531 B.R. 228, 235

(Bankr. W.D. Mo. 2015) (quotation omitted).  Subjective intent is often based on

circumstantial evidence because a debtor rarely admits to fraudulent intent. See, e.g.,

Treadwell v. Glenstone Lodge, Inc. (In re Treadwell), 637 F.3d 855, 863 (8th Cir.

2011) (noting that imputed fraud determination turned on "disputed facts, credibility

15

determinations, and the inferences a fact finder may choose to draw therefrom."). To

find fraudulent intent based on circumstantial evidence, the Court considers whether

"the totality of the circumstances 'presents a picture of deceptive conduct by the

debtor which indicates intent to deceive the creditor.'" Groetken v. Davis (In re

Davis), 246 B.R. 646, 652 (B.A.P. 10th Cir. 2000), aff'd in part, vacated in part on

other grounds, 35 Fed.Appx. 826 (10th Cir. 2002) (citations omitted).

When asked how he planned to give Gary Takuski the proceeds from the third

cutting when he had already told Wiedaman that Wiedaman could keep them, Debtor

answered that his plan was to pay the Takuskis when Wiedaman paid Debtor.  This

statement is nonsensical.  Wiedaman kept the proceeds from the third cutting as

partial payment for the debt Debtor owed, and Debtor could not have genuinely

believed that he would receive alfalfa hay proceeds to give to the Takuskis.  The

Court concludes that Debtor told Gary Takuski that he could have the proceeds from

the third cutting deliberately with intent to deceive him.

Next, the Takuskis must show that they justifiably relied on Debtor's

misrepresentation.  To meet the burden of showing justifiable reliance[8] under

section 523(a)(2)(A), a creditor may rely on a representation of fact even though

he might have discovered the falsity of the representation if he had investigated

the matter. Islamov v. Ungar (In re Ungar), 633 F.3d 675, 679 (8th Cir. 2011)

(citing Field v. Mans, 516 U.S. 59, 70–71 (1995)). However, creditors may not

---

[8] Justifiable reliance is a lesser standard than reasonable reliance. See Reuter
v. Cutcliff (In re Reuter), 443 B.R. 427, 435 (B.A.P. 8th Cir. 2011).

"turn a blind eye where a patent falsity could be determined by a cursory examination or investigation." Id. (quoting Field, 516 U.S. at 71) (internal quotations and citations omitted).  "In other words, if there are any warning signs . . . in the nature of the transaction, or in the debtor's conduct or statements, the creditor has not justifiably relied on his representation." Guske v. Guske (In re Guske), 243 B.R. 359, 363–64 (B.A.P. 8th Cir. 2000).  The question of whether reliance is justifiable is subjective and dependent upon the qualities and characteristics of the particular creditor, and the circumstances of the particular case.  In re Ungar, 633 F.3d at 679.  Courts may consider the following factors in determining whether a creditor's reliance was justifiable:

> (1) the parties' previous business dealings; (2) events which might have put the creditor on notice that the representations were not well-founded; (3) whether a simple inquiry or request for additional information might have revealed the misinformation; (4) the course of dealings between the creditor and the debtor; and (5) information commonly known about the particular industry.

Kassebaum v. Smith (In re Smith), 591 B.R. 741, 750 (Bankr. D. Minn. 2018) (quoting Hernandez v. Sulier (In re Sulier), 541 B.R. 867, 879 (Bankr. D. Minn. 2015)).  A "victim of fraud is not justified in relying on a representation, and a duty to investigate arises, where the facts should be apparent to one of his knowledge and intelligence from a cursory glance, or he has discovered something which should serve as a warning that he is being deceived." Hernandez v. Gen. Mills Fed. Credit Union (In re Hernandez), 860 F.3d 591, 604 (8th Cir. 2017).

In this case, the Takuskis justifiably relied on Debtor's misrepresentation that he would give them the proceeds from the third cutting.  After Debtor allegedly told Gary Takuski that he would not continue to farm the Takuski land and that he would give Takuskis the proceeds from the third cutting, Gary Takuski paid a third party $546 to stack the bales.  Gary Takuski paid for this service even though stacking hay bales falls within the scope of work Debtor agreed to perform for the Takuskis.  Gary Takuski testified that he thought the hay was his crop to sell. The Takuskis did not learn that Debtor allowed Wiedaman to keep the proceeds until Gary Takuski contacted Wiedaman about purchasing the third cutting.  The Takuskis relied on Debtors' representations that they would receive the proceeds of the third cutting.  Incurring $546 in hay stacking expenses and inquiring with Wiedaman about buying the third cutting is evidence of this reliance.  The Takuskis met their burden of establishing justifiable reliance.

Lastly, the Takuskis must show that Debtor's false representation proximately caused their injuries. See In re Smith, 591 B.R. at 750–51.  Additionally, a plaintiff must demonstrate that its loss was a foreseeable result of the debtor's false representation.  Davis v. Olson (In re Olson), 454 B.R. 466, 473 (Bankr. W.D. Mo. 2011).

The Court concludes that Debtor's false representation regarding the third cutting proximately caused the Takuskis to suffer damages, including the proceeds from the sale of this hay.  The proceeds from the third cutting total $5,370.50.  In addition, the Takuskis incurred $546 in hay stacking expenses in reliance on Debtor's

18

misrepresentations.  This is the total sum of the damages the Takuskis suffered that were proximately caused by Debtor's misrepresentation that he would pay the Takuskis the proceeds from the third cutting.  The Takuskis' other damages were not caused by this misrepresentation. <u>See</u> <u>In re Irons</u>, 2017 WL 943897, at *2 ("To have the debt excepted from discharge, the creditor must prove that the debtors obtained money or property from the creditor concurrent with the debtors' misrepresentation.") (citing <u>Marcusen v. Glen</u> (<u>In re Glen</u>), 639 F.3d 530, 533 (8th Cir. 2011); <u>Premier Bank v. Falco</u> (<u>In re Falco</u>), 2010 WL 5018295, at *5 (Bankr. W.D. Mo. Dec. 3, 2010) ("The law in this jurisdiction is clear that only the portion of the debt which results from the debtor's fraud is nondischargeable.").

The Takuskis met their burden of proving that the debt in the sum of $5,916.50 is excepted from discharge under section 523(a)(2)(A) based on Debtor's false representation.

        b.    Actual Fraud

Takuskis also assert that Debtor's conduct constitutes actual fraud.  In a 2016 decision, the United States Supreme Court found that the definition of "actual fraud" in the context of section 523(a)(2)(A) encompasses fraud that does not involve a misrepresentation from a debtor to a creditor, such as a fraudulent conveyance scheme.  <u>Husky Int'l Elec., Inc.</u>, 136 S.Ct. 1581 (2016).  It explained:

"Actual fraud" has two parts: actual and fraud. The word "actual" has a simple meaning in the context of common-law fraud: It denotes any fraud that "involv[es] moral turpitude or intentional wrong." <u>Neal v. Clark</u>, 95 U.S. 704, 709, 24 L. Ed. 586 (1878). "Actual" fraud stands in contrast to "implied" fraud or fraud "in law," which describe acts of deception that "may

exist without the imputation of bad faith or immorality."  Ibid. Thus,
anything that counts as "fraud" and is done with wrongful intent is "actual
fraud."

Husky, 136 S.Ct. at 1586; see In re Irons, 2017 WL 943897, at *3 (citing this

definition).  Although the Supreme Court did not adopt a specific definition of the

"fraud" component of "actual fraud" in Husky, it acknowledged that fraud "connotes

deception or trickery."  Husky, 136 S. Ct. at 1586.  Accordingly, the Takuskis must

show Debtor committed fraud with wrongful intent to prevail under the "actual fraud"

component of section 523(a)(2)(A).

In support of their claim that Debtor engaged in actual fraud, the Takuskis

assert that "it is clear by [Debtor's] actions prior to the 1st cutting of hay and false

statements to both Mr. Weidaman and Mr. Takuski, [Debtor] intended to defraud the

[Takuskis] of their share of the hay crop."  Doc. 66 at 6.  Specifically, they suggest

that his "intent was to defraud the [Takuskis], buy [sic] taking all of the hay, selling all

of the hay and taking all of the proceeds from the sale for himself without sharing with

the [Takuskis] as he was supposed to do through their agreement and use the fund

to finance his farming operations."  Id. at 7.

Aside from the false representation regarding the third cutting, the Court finds

that Debtor did not engage in deception, trickery or a scheme to deprive the Takuskis

of their money.  The parties disagreed about one important term of their agreement,

but neither the Takuskis nor Debtor confirmed their/his understanding before Debtor

performed his services.  The Takuskis understood that they would receive their half

of the alfalfa proceeds at the time Debtor marketed the hay.  Debtor assumed that

the parties would "settle up" both 2017 alfalfa proceeds and related expenses at the end of the season.  The Court finds Debtor's testimony regarding his understanding that the parties would "settle up" the alfalfa proceeds and expenses at the end of the season credible.  Debtor's conduct—retaining the proceeds from the first two alfalfa cuttings until he calculated all related expenses—was consistent with this understanding.  Debtor used the proceeds from the first two cuttings to fund his farming operations, assuming that his corn packing job together with proceeds from the sale of his millet crop would produce income sufficient to pay the Takuskis their portion of the net alfalfa proceeds.  As is often the case in farming operations, Debtor's plans did not come to fruition, and he was left without the ability to pay the Takuskis.  Debtor expressly denied that he intended to defraud the Takuskis, and the Court finds this testimony credible, particularly as it pertains to the proceeds from the first two cuttings.  Accordingly, the Court concludes that Debtor did not engage in actual fraud to deprive the Takuskis of their money, and the Takuskis failed to carried their burden of establishing actual fraud in this case.

The Court considered all other arguments and finds them unpersuasive or unnecessary to discuss.

## IV.     Conclusion

For the reasons stated above, the Takuskis satisfied their burden of proving

that the sum of $5,916.50 is excepted from discharge under section 523(a)(2)(A)

based on Debtor's false representation.

JUDGMENT MAY BE ENTERED ACCORDINGLY.

Dated:  August 12, 2019.

*Shon Hastings*

Shon Hastings, Judge
United States Bankruptcy Court